

## Fourth Court of Appeals
### San Antonio, Texas

## MEMORANDUM OPINION

No. 04-21-00146-CV

**IN THE INTEREST OF J.A.M. AND M.J.C.**, Children

From the 224th Judicial District Court, Bexar County, Texas
Trial Court No. 2020-PA-00682
Honorable Charles E. Montemayor, Judge Presiding

Opinion by:    Beth Watkins, Justice

Sitting:        Rebeca C. Martinez, Chief Justice
                Beth Watkins, Justice
                Lori I. Valenzuela, Justice

Delivered and Filed: September 22, 2021

AFFIRMED

J.M. appeals the trial court's order terminating his parental rights to his sons, J.A.M. (born 2016) and M.J.C. (born 2018).[1] J.M. argues the evidence is legally and factually insufficient to support the trial court's findings that termination is in the best interest of the children, and the trial court abused its discretion in appointing the Texas Department of Family and Protective Services managing conservator over them. We affirm the trial court's order.

### BACKGROUND

Before March of 2020, the romantic relationship between J.M. and T.C. had ended, but they lived together with their two sons (J.A.M. and M.J.C.), T.C.'s infant daughter (R.C.),[2] and

---

[1] To protect the privacy of the minor children, we use initials to refer to the children and their biological parents. TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b)(2).
[2] While R.C.'s father is unknown, it is undisputed that J.M. is not her father.

J.M.'s mother—in her home. After T.C. was arrested in March, the Department obtained temporary managing conservatorship over all three children and placed R.C. in a foster home; the boys continued to live with J.M. and his mother. The Department created a family service plan requiring J.M. to, inter alia, obtain stable housing and employment and submit to drug testing.[3] J.M. failed a drug test in July 2020, and the Department removed the boys from his care, placed them in foster care, and ultimately pursued termination of the parental rights of J.M., T.C., and R.C.'s unknown father.

Twelve months after the Department filed its petition, the trial court held a one-day bench trial via Zoom. After hearing testimony from the Department's caseworker and J.M., the court found that the parents had committed acts supporting termination under Texas Family Code section 161.001(b)(1) and that termination was in the children's best interest, so it signed an order terminating the rights of J.M., T.C., and R.C.'s unknown father. Only J.M. appealed.

### ANALYSIS

#### *Best Interest*

In his first issue, J.M. challenges the legal and factual sufficiency of the evidence on which the trial court relied to conclude that termination was in the best interest of the children.

#### *Standard of Review*

The involuntary termination of a natural parent's rights implicates fundamental constitutional rights and "divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent." *In re S.J.R.-Z.*, 537 S.W.3d 677, 683 (Tex. App.—San Antonio 2017, pet. denied) (internal quotation marks omitted). "As a result, appellate courts must strictly scrutinize involuntary termination

---

[3] The Department also created a family service plan for T.C., but the testimony at trial showed that the caseworker had no contact with T.C.

proceedings in favor of the parent." *Id.* The Department had the burden to prove, by clear and convincing evidence, both that a statutory ground existed to terminate J.M.'s parental rights and that termination was in the best interest of the children. TEX. FAM. CODE ANN. § 161.206; *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *In re S.J.R.-Z.*, 537 S.W.3d at 683.

In reviewing the legal sufficiency of the evidence to support the trial court's findings, we look "at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009) (internal quotation marks omitted). In reviewing the factual sufficiency of the evidence, we consider disputed or conflicting evidence. *Id*. at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). The factfinder is the sole judge of the weight and credibility of the evidence. *In re J.O.A.*, 283 S.W.3d at 346.

*Applicable Law*

There is a strong presumption that a child's best interest is served by maintaining the relationship between a child and the natural parent, and the Department has the burden to rebut that presumption by clear and convincing evidence. *See, e.g.*, *In re R.S.-T.*, 522 S.W.3d 92, 97 (Tex. App.—San Antonio 2017, no pet.). To determine whether the Department satisfied this

burden, the Texas Legislature has provided several factors[4] for courts to consider regarding a parent's willingness and ability to provide a child with a safe environment, and the Texas Supreme Court has provided a similar list of factors[5] to determine a child's best interest. TEX. FAM. CODE ANN. § 263.307(b); *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

A best interest finding, however, does not require proof of any particular factors. *In re G.C.D.*, No. 04-14-00769-CV, 2015 WL 1938435, at *5 (Tex. App.—San Antonio Apr. 29, 2015, no pet.) (mem. op.). Neither the statutory factors nor the *Holley* factors are exhaustive, and "[e]vidence of a single factor may be sufficient for a factfinder to form a reasonable belief or conviction that termination is in the child's best interest[.]" *In re J.B.-F.*, No. 04-18-00181-CV, 2018 WL 3551208, at *3 (Tex. App.—San Antonio July 25, 2018, pet. denied) (mem. op.). Additionally, evidence that proves a statutory ground for termination is probative on the issue of best interest. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). Finally, a trier of fact can "measure a parent's future conduct by his past conduct" in determining whether termination of parental rights is in a child's best interest. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied).

---

[4] These factors include, inter alia: "(1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills [. . .]; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child." TEX. FAM. CODE § 263.307(b).

[5] Those factors include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist those individuals to promote the best interest of the child; (6) the plans for the child by these individuals or the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley*, 544 S.W.2d at 371–72.

*Application*

**The Facts as Presented at Trial**

J.M. had the boys in his custody for four months after the Department became involved. The caseworker recognized he is "very bonded with the boys" and "they love him very much." The boys were also bonded as siblings. But at the time the Department became involved, J.A.M. had "a lot of behavioral issues" and it "was very obvious that he needed extra help, such as speech therapy and behavioral therapy." The caseworker therefore made a referral for early childhood intervention services for the boys and made parenting classes and drug testing a part of J.M.'s service plan. J.M. "never called to schedule" the intervention services, did not take a parenting class, and took only one drug test—where he tested positive for methamphetamine. According to J.M., he did not comply with drug testing because:

> There was a stay-at-home order. And I didn't have a vehicle. And at that time, my mom was in the hospital. I didn't have nobody to watch the kids. I wasn't working, so I couldn't pay for a sitter for me to go anywhere. I didn't want to take the chance to go out and get sick and bring it back home.

He also testified there was a waiting list for the early intervention appointments.

J.M. acknowledged his "poor choice" of using drugs while the boys were under his care, and that their removal coincided with an eviction that rendered him homeless and living on the streets for six months. J.M. testified he lost his job performing apartment maintenance due to the pandemic and lost his housing because he lost his job. For the first three months he was homeless, he did not communicate with the caseworker at all and she "had no idea where he was." He re-engaged with the caseworker in October and started parent-child visits. However, J.M. attended less than half of his scheduled visits and provided various excuses. He sometimes would confirm a visit but not show up, leaving J.A.M. disappointed and withdrawn. When he did attend the visits, though, they were "very appropriate."

Meanwhile, J.A.M. and M.J.C. were faring well in foster care. They were initially placed together, but that home was unable to meet J.A.M.'s needs, so the Department moved the boys to another home. M.J.C. was still in that home at the time of trial, but J.A.M. "needed more one-on-one attention," so was moved to a home with no other children. At the time of removal, J.A.M. was very "defiant," "hard to control," and "not able to communicate." At the time of trial, he was "doing really well" and "steadily improving." M.J.C. was "well-rounded" and "happy." At J.M.'s last visit with the boys, J.A.M. hugged his brother like "he missed him."

J.M. testified he moved into a friend's apartment approximately eight months before trial. The caseworker said she was not able to study this home because J.M. never provided the address, but she understood it was "not a permanent residence for him." And J.M. provided only one paystub though the caseworker had asked him to provide them monthly.

J.M. testified that he collects $800 every two weeks in unemployment and performs small jobs for a friend. He said the reason he had not shown additional proof of income or provided an address for a home study yet was because of miscommunication with the caseworker. After noting there had been "five hearings," "zero therapy," "one drug test," and evidence that J.M. lacked "stability" or "solid employment," the trial court terminated J.M.'s parental rights.

**Application of the Relevant Factors**

J.M. acknowledges his shortcoming and does not challenge the trial court's predicate findings, by clear and convincing evidence, that he constructively abandoned the children, failed to comply with the provisions of the court order that specifically established the actions necessary for him to obtain the return of the children, or used a controlled substance and failed to complete a court-ordered substance abuse treatment program. TEX. FAM. CODE ANN. § 161.001(b)(1)(N), (O), (P). J.M. argues, rather, that he should not lose his parental rights because he lost his job, and then his housing, due to the pandemic. But these predicate grounds are themselves probative on

the issue of best interest. *In re C.H.*, 89 S.W.3d at 28. And several of the best interest factors support the trial court's best interest finding.

First, the evidence supports a finding that J.M. lacks the ability to meet the children's current and future emotional and physical needs. *See Holley*, 544 S.W.2d at 371–72; TEX. FAM. CODE § 263.307(b)(1), (12). He has not had a residence suitable for the children since the Department removed them. He bounced from "the streets" to living with a friend, and although he testified he was planning on getting his own apartment, at the time of trial, he lacked a safe, stable home to meet the children's physical needs.

J.M. failed to communicate at all with the caseworker—and through her, his children—for three months after they were removed from his custody. Once he re-engaged, his inconsistent visitation took an emotional toll on J.A.M. *See In re R.M.*, No. 07-12-00412-CV, 2012 WL 6163100, at *4 (Tex. App.—Amarillo Dec. 11, 2012, no pet.) (mem. op.) (recognizing potential emotional consequences to child due to inconsistent visitation). This evidence supports a conclusion that J.M. cannot meet the physical and emotional needs of the children.

Second, J.M.'s drug use could support a conclusion that he exposed the children to emotional and physical danger. TEX. FAM. CODE § 263.307(b)(8). J.M. argues that when they were removed from his care, "there was no evidence the children were suffering from any abuse or neglect or were in danger in any way." However, at trial, J.M. acknowledged using drugs while he had the children. The trial court could measure J.M.'s "future conduct by his past conduct" in making its best interest finding. *In re E.D.*, 419 S.W.3d at 620. The trial court could also consider J.M.'s refusal to submit to drug tests as evidence of continued drug use. *See In re E.R.W.*, 528 S.W.3d 251, 265 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

Third, J.M.'s failure to engage in services aimed at improving his parental fitness supports a finding that he could not meet J.A.M.'s special needs. *See Holley*, 544 S.W.2d at 371–72; TEX.

FAM. CODE § 263.307(b)(10), (11). As a three-year-old, J.A.M. "sounded like he spoke his own language," yet J.M. proved either unwilling or unable "to seek out, accept, and complete" the parenting and early childhood services essential to J.A.M.'s development. By the time of trial, J.A.M. was "able to say words, he's able to say sentences, he's able to identify colors, he's even able to, like, draw letters, and things like that. He has made quite a bit of improvements." *See In re T.T.*, 228 S.W.3d 312, 323–24 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (evidence children's conditions improved while in foster care supports trial court's best-interest finding). Although he acknowledged J.A.M.'s special needs, J.M.'s failure to undertake services to help him meet those needs supports the trial court's best interest finding.

Fourth, at trial, J.M. had no plan for the children. *Holley*, 544 S.W.2d at 371–72; TEX. FAM. CODE § 263.307(b)(12). He wanted the children permanently, but acknowledged, "there's going to be steps to that." When pressed on his ability to take the children, he explained he had "the money to go get an apartment today," and that he had not due to a miscommunication. In contrast, the Department was working towards permanent placement for both boys. *See Holley*, 544 S.W.2d at 371–72. J.A.M.'s current placement was intended to be permanent, and the caseworker did not see any "issues as far as finding placement for" M.J.C. The caseworker had already "found a couple of homes" that "would be appropriate for him and that are willing to adopt." At the same time, the Department was vetting a cousin of J.M.'s for placement of both the children. *Holley*, 544 S.W.2d at 371–72; TEX. FAM. CODE § 263.307(b)(12). J.M.'s failure to plan for the children's future supports the trial court's best interest finding. *See In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (noting establishment of a stable, permanent home is the paramount consideration in a best interest determination).

**Conclusion**

After reviewing the evidence under the appropriate standards, we conclude a reasonable factfinder could have formed a firm belief that termination of J.M.'s parental rights was in the best interest of J.A.M. and M.J.C. *In re J.F.C.*, 96 S.W.3d at 266. Moreover, the evidence contrary to the trial court's finding was not so significant that a factfinder could not reasonably have formed a firm belief or conviction. *See id.* We therefore conclude legally and factually sufficient evidence supports the trial court's best interest finding.

### *Conservatorship*

We review the trial court's appointment of a nonparent as sole managing conservator for an abuse of discretion and will reverse that appointment only if we determine it is arbitrary or unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). The best interest of the child is the primary consideration of the trial court in determining the issues of conservatorship and possession of and access to the child. TEX. FAM. CODE ANN. § 153.002. Having determined the evidence is legally and factually sufficient to support termination of J.M.'s parental rights, we necessarily hold the trial court did not abuse its discretion in appointing the Department managing conservator. *See In re L.G.R.*, 498 S.W.3d at 207. We overrule J.M.'s final issue on appeal.

### CONCLUSION

We affirm the trial court's order of termination.

Beth Watkins, Justice